IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 4:21-cr-097 |
| | ) | |
| v. | ) | |
| | ) | |
| CHAD ALLEN WILLIAMS, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

**INTRODUCTION**

On July 15, 2021, the government obtained a three-count indictment charging the defendant, Chad Williams, with being an unlawful drug user in possession of a firearm, on or about June 18, 2021, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); making a destructive device, on or about June 9, 2021, in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871; and possession of an unregistered destructive device, on or about June 9, 2021, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. A notice of forfeiture was also filed, pursuant to 18 U.S.C. § 924(d), 26 U.S.C. § 5872, and 28 U.S.C. § 2461(c). On January 20, 2022, Mr. Williams formally accepted responsibility for his offense by pleading guilty to being an unlawful drug user in possession of a firearm and making a destructive device, and by consenting to forfeiture, all pursuant to a written plea agreement that calls for dismissal of count three at the time of sentencing. The Court accepted the plea and adjudicated him guilty on February 7, 2022.

The presentence report drafter determined that his base offense level under the advisory sentencing guidelines is 20, pursuant to USSG §2K2.1(a)(4)(B). (PSR ¶30). Because the offense involved a destructive device, two additional levels were added. (PSR ¶31). Because the

destructive device was used in connection with another felony offense, four additional levels were added.[1] (PSR ¶32).  After calculating Mr. Williams' criminal history category as I (PSR ¶47), and applying a three-level reduction for acceptance of responsibility (PSR ¶38, 39), Mr. Williams is at a total offense level of 23, and has an advisory sentencing guideline range of 46 to 57 months of imprisonment. (PSR ¶108).  Mr. Williams respectfully argues that the advisory sentencing range is greater than necessary in this case, and that a sentence below the range would be sufficient under the factors of 18 U.S.C. § 3553(a).

## ARGUMENT

Chad Williams is a former Navy petty officer and engineer. (PSR ¶100).  He served two tours in 1997 and 1999 in the Persian Gulf, China, Singapore, and Australia, among other places. *Id*.  He was honorably discharged from his service, and went on to work for FedEx as a delivery driver. (PSR ¶¶97, 100).  Utilizing the skills he learned, he and his wife started an independent contracting company making deliveries with FedEx from 2010 through 2016. (PSR ¶97).  He then went on to work as mail carrier for the United States Postal Service from 2017 until

---

[1] Mr. Williams objected to application of this specific offense characteristic based on the Iowa offenses of intimidation of with a dangerous weapon and harassment.  Intimidation with a dangerous weapon requires discharge of a weapon into or at an occupied structure or within an assembly of people such that the occupants or people are placed in reasonable apprehension of serious injury. Iowa Code § 708.6(2).  The devices in this case were placed on the street, there was no assembly of people, and no evidence anyone in such an assembly was placed in reasonable apprehension of serious injury.  Harassment contemplates the use of a "simulated" explosive or incendiary device, rather than an actual one, and the text should be applied in the manner in which it reads. Iowa Code § 708.7(1)(a)(2).  Mr. Williams continues to concede, however, that his conduct would qualify as arson under Iowa law, because the offense involved placing an explosive device near property with intent to damage the property. Iowa Code § 712.1(1).  Because Mr. Williams concedes applicability of the specific offense characteristic on this basis, the Court need not adjudicate whether it also qualifies under the objected-to offenses. *See* Fed. R. Crim. P. 32(i)(3)(B) (noting that the Court need not rule on disputed issues in the presentence report that will not affect sentencing).

February of 2021, before briefly working as a delivery and installation technician at Integral Delivery Service prior to his arrest in this case. (PSR ¶95).

Mr. Williams' work ethic and success likely stem from what appeared to be a relatively stable upbringing, combined with the skills and discipline he learned in the Navy. Apart from his time in the Navy, he has been a life-long Iowa resident. (PSR ¶68). His biological mother died when he was only two years old, but was then adopted by his biological father and raised by he and his wife along with their five other children. (PSR ¶52). His father was a heavy equipment operator, and they had a very close relationship in which Mr. Williams held his father in very high regard. (PSR ¶55). His basic needs were always met, and he grew up playing sports and doing family activities. *Id*. He never had any problems in school, and successfully graduated from high school prior to enlisting in the Navy. (PSR ¶91). He married in 2008, and has an eight-year-old daughter and four-year-old son that are both healthy. (PSR ¶66).

Nevertheless, things that look good on the surface can still contain darkness underneath, and such has been the case with Mr. Williams' life. The father with whom he was very close also suffered from anxiety and depression, was physically and verbally abusive to Mr. Williams at his low moments, and also used methamphetamine with him when he was a young adult.[2] (PSR ¶¶52, 55, 84). Some of his half-siblings have also struggled with mental illness and substance use problems throughout their lives. (PSR ¶¶58, 60, 61, 64, 65). A half-sister died from a brain tumor at the age of thirteen, and his oldest half-sibling died from suicide. (PSR ¶¶58, 62). Mr. Williams also had a child at the age of eighteen, but lost contact with the mother

---

[2] The presentence report and letters of support in this case illustrate how events Mr. Williams endured as a child defined his idea of normalcy. He does not perceive himself as having suffered anything particularly abusive during his childhood, but those who he told about the events noted in the presentence report and in the letters to the Court recognize it for what it was.

of his now-adult daughter when he enlisted in the Navy, and he and his daughter's relationship became distant over the years and she now resides in Florida. (PSR ¶67). Cementing the trauma of losing his biological mother at a young age, his adoptive mother treated him differently from her other children. (PSR ¶57). She would do things like "forget" his birthday, and lock him out of certain cabinets so he could not eat "her" food. *Id*. His father was essentially the real source of support for Mr. Williams, and after his death, his adoptive mother cut ties with him. *Id*.

While the seeds of trauma were planted during his childhood, they germinated later in life, as unresolved traumas tend to do. Besides losing closeness with his daughter as he built up his adult life, his father died only a month before his wedding. (PSR ¶66). The loss of his source of support with whom he was extremely close was obviously "very hard" on Mr. Williams, to the point that it was very obvious to his wife that it impacted him, and she relayed that fact to the probation officer who drafted the presentence report. *Id*. This event then led to the deterioration of an already somewhat challenging relationship with his adoptive mother, as noted above. Mr. Williams' strongest source of support became his wife at that point in his life.

Even by the time of his wedding, however, Mr. Williams already had a secret methamphetamine problem, and was using the drug daily to cope with the stress he felt in his everyday life. (PSR ¶¶84-85). He experienced another significant trauma a few years later when one of the drivers in his business had an accident that resulted in the death of a woman in another vehicle. (PSR ¶98). Civil lawsuits, press coverage of the accident, and stalking by the woman's husband followed the tragedy, which not only hurt the business and contributed to its downturn and eventual sale, but also caused extreme stress on Mr. Williams on an individual level. (PSR ¶98). His methamphetamine use continued to be a coping mechanism not only for himself in private, but also in the work environment where other traumatized users were present. *Id*.

Methamphetamine use was a false and temporary mental escape mechanism from his problems, and something he turned to try to pick himself up during problematic times, such as when he suffered serious back problems for a few years that affected his ability to work and sapped him of his pride until he eventually had surgery to repair the problems. (PSR ¶75).

      Mr. Williams continued to avoid addressing and resolving traumatic events over the years by continuing to use methamphetamine as part of his life. Recognizing that he was struggling on some level, he did eventually seek help through inpatient treatment services at the Veteran's Administration Central Iowa Health Care System in 2018, where he was diagnosed and treated for ongoing severe methamphetamine use disorder and successfully completed the treatment program. (PSR ¶87). However, he was not able to maintain sobriety for long after the program, and hid his subsequent relapse and the extent of his struggles from his wife just as he had before. (PSR ¶85). The secret chaos within himself then turned to commencement of a turbulent romantic affair in November of 2018, which continued for several years. (PSR ¶15).

      The offenses in this case were offshoots of the chaos buried in Mr. Williams that were exasperated and further fueled by the extent of his methamphetamine addiction. The on-again off-again nature of his affair and its eventual end further fueled his muddled mental state, and a man that was dating his paramour's sister (who lived with her) and spending time at the residence drew his ire. (PSR ¶23). Mr. Williams was upset that the boyfriend had criminal history, and was also deeply offended that the man claimed to have served in the military. *Id*. Mr. Williams was distressed to a degree that he even made an anonymous tip about the boyfriend suggesting he may be involved in a burglary, and alleging he and the other occupants of his paramour's home were using methamphetamine. (PSR ¶14). His troubled mental state then led to Mr. Williams crafting homemade destructive devices in his garage out of serial firework

shells, which he intended to detonate to damage the boyfriend's truck that was parked on the street, and to generally "piss [him] off." (PSR ¶23).

The first explosive device was dropped in the street outside Mr. Williams' paramour's home on May 12, 2021, at around 11:30 at night. (PSR ¶10). It exploded in the street, and the incident was captured on a doorbell camera. *Id*. A second explosion was recorded on June 7, 2021, at 12:35 in the morning in the same area. (PSR ¶11). The final explosive device was found in the middle of the street two days later. (PSR ¶12). The unexploded device contained various shrapnel-type items as part of it, and it appeared that the fuse had been lit but that the device failed to detonate. *Id*.

Subsequent investigation of the events was able to associate the vehicle involved in leaving the devices on the street with Mr. Williams. (PSR ¶¶16, 18). An interview with his former paramour and examination of her cell phone further linked Mr. Williams to the anonymous tip about the boyfriend. (PSR ¶15). Additional text messages from Mr. Williams to his former paramour a week after the unexploded device was found alluded to him believing she had turned him in as the suspect who dropped the explosive devices in the neighborhood. (PSR ¶17). A search warrant was then obtained and executed on his home on June 18, 2021, which located evidence related to the construction of the explosive-type devices in the garage. (PSR ¶19). It also discovered evidence of his methamphetamine use, and that he owned two nine-millimeter pistols, one of which was in safe in the residence, and the other on the driver's floorboard of his work truck. (PSR ¶¶19–20). A State of Iowa Permit to Carry in his name was also located, along with one gram of methamphetamine. *Id*. A second search warrant for urine and hair samples was executed on Mr. Williams a week later, which confirmed the presence of amphetamine in his system. (PSR ¶21).

Mr. Williams was cooperative with law enforcement authorities and consented to a post-*Miranda* interview during execution of the search warrant, where he confessed to making the destructive devices in his garage, explained his motive, and admitted that he had dropped the devices in the street as described above. (PSR ¶22).  He described how he built the unexploded device that was recovered, noted that he had lit the fuse and dropped it in the street, and that he assumed he ran over it when he did not see or hear it go off. *Id*.  He was subsequently arrested on the criminal complaint in this case, and has continued to accept responsibility for his offenses without wavering after the indictment was returned and the case proceeded.

The question now before the Court is what sentence is "sufficient, but not greater than necessary" for Mr. Williams in this case.  Obviously, any offense involving an explosive device a serious one with major risks of potential harm, even if Mr. Williams' actual intent with the devices was just to damage property.  This reality is reflected in the fact that the third device did not explode, and could have been inadvertently set off by whoever found it if they had not been careful and reported the device to law enforcement.  The possession of the firearms as a drug user, while still a serious felony offense under the law, is somewhat less concerning here given that Mr. Williams' possession only became illegal due to his drug use, and given his background and training in the responsible handling of such weapons.  The guns involved in the case were located in his home and in a vehicle that was not involved in the other offenses.  Clearly, the destructive device offense is the driver of the seriousness and danger to the community element of this case.

However, it is also obvious that Mr. Williams' mind was addled by unresolved traumas and long-term methamphetamine use that clouded his senses and contributed to his irrational actions.  Getting hung up on a girlfriend, and being so deeply disturbed by the conduct and

perception of the girlfriend's sister's boyfriend such that he was motivated to utilize home made explosives to cause a scene and try to damage a vehicle, is simply not a rational response to anything. This conduct is clearly an aberration in Mr. Williams' life, given that his prior criminal history consists only of operating a vehicle while intoxicated when he was eighteen and fifth degree thefts over the span of a week and a half when he was twenty-one where he shoplifted a package of meat and two packs of cigarettes. (PSR ¶¶43–45). Nothing about the offenses in this case make sense, unless the role of jumbled and drug-influenced mind motivating the actions is taken into account.

Indeed, Mr. Williams has demonstrated throughout the pendency of this case that he is able to abide by the rules and conditions placed upon him once he got away from using methamphetamine. After initially deferring a detention hearing, he was released after around three and half months to participate in the residential treatment program through the Veteran's Administration Central Iowa Health Care System. (PSR ¶7). He successfully completed that program on November 16, 2021, during which he received substance abuse treatment, mental health treatment, and other correctional and rehabilitative care through the VA programs. *Id*; *see also* Def.'s Ex. B (VA discharge summary). Given the nature of the offense, the Probation Office and the Magistrate Judge overseeing the case then wanted a risk assessment conducted before taking a position on the next steps regarding Mr. Williams' continued release after completing the program, and he returned to custody while that was pursued. That assessment was recently completed, and indicates that Mr. Williams has a "relatively low risk for violence if placed on community supervision." *See* Def.'s Ex. A (Psychological Risk Assessment). The psychologist further noted that this low risk can be further reduced if Mr. Williams receives additional treatment for substance abuse and help with learning better coping skills. *Id*. She also

observed that Mr. Williams was consistent in his recitation and acknowledgement of his conduct, and that he was embarrassed and ashamed by it. *Id*. He had insight into the role methamphetamine played in his behavior, but did not blame the drug in any effort to absolve himself from all responsibility for his actions. *Id*. He also correctly recognized that his level of anger and subsequent actions related to the false claims of military service were irrational and disproportionate related to the actual conduct that bothered him. *Id*. The assessment corroborates the reality that this behavior was an aberration caused by underlying traumas that had not been addressed, and that were exacerbated by the effects of Mr. Williams' long-term methamphetamine problem. It also demonstrates that the need to protect the public from further crimes by Mr. Williams is minimal at this point, particularly if he receives the recommended correctional and rehabilitative treatments in the future.

    Related to his insight into his conduct and the problems underlying it, any sentence the Court imposes in this case will have significant deterrent effect on Mr. Williams, and it is clear that what he has experienced so far has already had both significant rehabilitative benefits for him, while also providing strong deterrent impact. He has served over eight months in custody with no correctional programming available to him in the jail due to COVID-19 restrictions in the facility, and has been released and successfully completed the VA program only to have to return to custody while awaiting completion of the risk assessment in this case. Despite that hardship, he has maintained sobriety and had no discipline problems or rule violations of any sort at any point. He has also endured the high degree of public scrutiny surrounding the case, and the humiliation of the circumstances surrounding and underlying his offenses being widely known and in the public eye. The collateral consequences have been very harsh, as he is not only now a felon, but lost many of the rights and privileges of citizenship. His conduct has

placed great strain on his marriage and resulted in his wife suffering from anxiety and other duress while she balances her own health and taking care of their young children in his absence with remaining supportive of him through this case. (PSR ¶66).

The Court faces the difficult task of determining what is a "just" sentence that promotes respect for the law, given the nature and circumstances of the offense and Mr. Williams' personal history and characteristics. The Court has every option available to craft the appropriate sentence in this case. The advisory sentencing guidelines recommend a sentence of 46 to 57 months of imprisonment, but the guidelines do not consider the individual history and characteristics of Mr. Williams discussed above, because such matters are not readily quantifiable in a regimented and generally applied sentencing system. *See Rita v. United States*, 551 U.S. 338, 348 (2007) (observing that the sentencing commission attempts to fulfill the 18 U.S.C. § 3553(a) objectives at "wholesale," while the sentencing judge does so at "retail."). Nor do the advisory guidelines do much to effectively distinguish between the degrees of conduct associated with these types of offenses, which the commentary to guidelines themselves generally acknowledges. *See* USSG § 2K2.1, n.7 (discussing that the guideline covers a wide range of conduct and that there is a difference between offenses involving explosives in crowded populated areas versus incendiary devices in isolated ones that can only be accounted for via the use of departures or variances where appropriate to the case). Therefore, while danger is inherent to the offense conduct in this case, it does not obviously follow that the advisory sentencing range is inherently appropriate, particularly when the conduct is tempered against the individual history and characteristics of Mr. Williams discussed above. The weighing of these factors in the sentencing decision is how both unwarranted sentencing disparities and unwarranted sentencing similarities are avoided. *See Gall v. United States*, 552 U.S. 38, 54–56

(2007) (approving the district court's analysis of why a below-guideline sentence for the particular defendant under the circumstances of the case did not violate the requirement to avoid unwarranted sentencing disparities).

 Furthermore, while Mr. Williams knows that a sanction is required under the law, it does not necessarily follow that he needs to be further imprisoned in this case to effectuate the sentencing goals of 18 U.S.C. § 3553(a), given the discussion above.  Prison is a punitive sanction alone, and not tied to providing correctional and rehabilitative treatment. *See* 18 U.S.C. § 3582(a) (reminding courts that "imprisonment is not an appropriate means of promoting correction and rehabilitation").  Mr. Williams has the characteristics of someone who will be successful on supervision, making a sentence favoring supervision and continued rehabilitation rather than punitive incarceration alone will do more to not only benefit Mr. Williams, but also the overall community.  His prior military service, lack of significant criminal history, and the support system he has in place, all suggest he can thrive with further correctional and rehabilitative care (a process he has already begun during his time at the VA facility), and that he will comply with the terms of community supervision. *See Porter v. McCollum*, 558 U.S. 30, 43–44 (2009) (discussing the "long tradition of according leniency to veterans in recognition of their service").  A lengthy term of imprisonment is not necessary to effectuate the goals of sentencing, and this is a case where supervision makes more sense to address any lingering community safety concerns rather than imposing an unnecessary term of incarceration to effectuate the sentencing goals of 18 U.S.C. § 3553(a).

 As discussed above, Mr. Williams' life was never as pristine as it may have appeared on the surface, and the underlying unaddressed traumas and struggles manifested in the irrational and aberrational offense conduct in this case.  However, he recognizes the seriousness of his

offense, and has accepted responsibility for his actions throughout the investigation and all legal proceedings. He is sober now, has received needed mental health treatment and is on helpful medications, has insight into how he got to this point, and is committed to continuing the progress he has already begun to address his rehabilitative and correctional needs. (PSR ¶¶76–80, 88–89). Mr. Williams is prepared to face the consequences in this case that the Court believes are necessary. Given Mr. Williams' circumstances and his individual history and characteristics, no unwarranted sentencing disparity will result from imposing a below-guideline sentence. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

      For all the reasons discussed above, Mr. Williams respectfully argues that the advisory sentencing range in this recommends a greater than necessary sentence, and requests that the Court impose a sentence below the range because such a sentence is sufficient to fulfill the goals of 18 U.S.C. § 3553(a) in this case as applied to him. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."); *accord Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (emphasizing that the law instructs sentencing courts to impose sentences that are not greater than necessary to comply with the goals of 18 U.S.C. § 3553(a)).

                                                                               Respectfully Submitted,

                                                                               */s/ Joseph D. Herrold*  
                                                                               Joseph D. Herrold  
                                                                               Assistant Federal Defender

FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties.

*/s/ Morgan Conn*, Paralegal